Good morning, and may it please the Court. Ashley Chung for the Federal Defendants. I'd like to reserve five minutes for rebuttal. The District Court erred in enjoining two federal agencies from taking enforcement actions based on positions that the government has not actually adopted, and where plaintiffs have not demonstrated any credible threat of enforcement. The District Court's permanent injunctions are based on the premise that HHS and EEOC have interpreted and will enforce Section 1557 of the Affordable Care Act and Title VII to mandate that these religious plaintiffs provide and cover gender transition services. But this premise is incorrect. The agencies have not, in fact, taken a position either way on whether objecting religious entities are required to provide and cover transition services. And in fact, neither agency has ever taken any enforcement action against any entity for declining to cover transition services, let alone in objecting religious entity. Well, hadn't Walker, the Walker case, ordered HHS to treat the operative language as requiring no discrimination based on gender identity? Your Honor, the Walker case did enjoin HHS's 2020 rule to some extent, but the Walker court acknowledged that because another district court in the Franciscan Alliance case had vacated the provision of the 2016 rule that defined discrimination on the basis of sex to include gender identity, the Walker court said, I know that I have no power to overturn the vacature of another district court. So I think there's no way to read the Walker decision to do something that the court acknowledged it had no power to do. Well, didn't it acknowledge it, but didn't it then pick a different term? And I've forgotten exactly which term it was, but pick a different term and say that that one does apply and therefore HHS is required to make sure there's no discrimination based on gender identity. The Walker court did focus on a different term, sex stereotyping, which is different from gender identity. I think at most it's unclear how the different provisions of the 2016 rule and the 2020 rule interact. But isn't the court essentially saying all of these should be treated as discrimination on the basis of sex? That's essentially what the Walker court says, Your Honor, but it did acknowledge that it couldn't overturn the vacature from the Franciscan Alliance court. And even assuming that the gender identity provision from the 2016 rule is back in play, plaintiffs have still not demonstrated a credible threat of enforcement because of the uncertainty about how these different provisions interact. And here- But you're saying the government at this point has not made a decision. It's not disavowing that it might pursue claims, but you're saying right now it just hasn't decided. That's right, Your Honor. The government is not in a position to disavow any future enforcement because the agencies are still in the process of considering these complicated issues. And what the agencies can do, they will evaluate RFRA and any other religious exemptions in the context of any specific complaint or specific charge of discrimination. So RFRA is not only an affirmative defense that plaintiffs can raise in court, but it informs how the agencies will exercise their enforcement discretion, how they decide how and when to bring enforcement actions. So the EEOC has acknowledged this in its compliance manual on religious discrimination. In the manual, EEOC acknowledges that Bostock says that RFRA might supersede Title VII in appropriate cases, and EEOC discusses the importance of a nuanced balancing of the different interests on either side. And it discusses the need for specific facts in order to do this important balancing. The compliance manual also counsels EEOC investigators to take great care when the issue of RFRA and its interaction with Title VII comes up. And it tells them that they should consult and seek the advice of EEOC legal counsel and perhaps with DOJ. Similarly, HHS's main notice of enforcement interpreting Bostock specifically acknowledges RFRA, and it says that RFRA will inform how the agency enforces Section 1557. So in light of this background where the agencies were saying that they will take RFRA into account when determining whether to bring any specific enforcement action, there is no credible threat of enforcement here. Bostock— Didn't, though, subsequently the Whitman-Walker case, didn't that enjoin the enforcement of the religious exemption? That's right, Your Honor. The Whitman-Walker case did enjoin the 2020 rules adoption of the religious exemption from Title IX, but that religious exemption is separate from RFRA. RFRA is a freestanding federal statute that still provides protections to these religious entities and that the agencies have acknowledged is an important statute and that they will abide by the law. The enforcement framework for both EEOC and HHS makes it so that there are many opportunities for the agencies to consider RFRA before they bring any enforcement action in court or revoke federal funding. There are many opportunities in the back and forth between the agencies and the entities where RFRA can be raised. So, for example, in the Fifth Circuit's decision in Newsom v. EEOC, an employee filed an administrative charge alleging discrimination, but in response, the employer raised a religious exemption and then EEOC dismissed the charge. It decided not to bring any enforcement action in court. I think it's also important to emphasize that the RFRA analysis can't be conducted in the abstract. The Supreme Court made clear in Ocentro that the RFRA analysis needs to be tailored to the person, to the specific facts at issue, and the specific exemptions that the specific religious claimant is seeking. And here, we have no facts. There is no context of the agencies actually asking a specific religious entity to do anything specific. You know, plaintiffs refer to gender transition, but transition can mean different things in different contexts. It encompasses everything from surgery to hormones to counseling services to hair removal. And in a specific case, it can be unclear what constitutes transition and different religious entities might draw the line in different places. So for example, you might have a transgender patient with severe endometriosis, and that patient might need a hysterectomy to treat that severe endometriosis. The transgender patient might also want a hysterectomy as part of gender transition, but in this specific context, there would need to be a lot of factual development as to what the medical services really are, whether they're transition services or not. And without any context in this case, there's no way to properly conduct the RFRA analysis, and there's no concrete case or controversy for the court to decide. So how is this case different from the contraceptive mandate cases, where no court dismissed for lack of standing, and then the Supreme Court went on to hold that RFRA precluded enforcement of the mandate against religious objectors? Your Honor, the contraceptive mandate cases involved a situation in which the government was mandating something specific. The government was mandating that entities cover specific forms of contraception. But here, the government isn't mandating anything, and there is no clarity as to what the agencies might ask a specific religious entity in a specific case. We would have to look at, you know, what the different insurance plans say, whether they cover, you know, some things or not other things. We would have to look at what kinds of medical procedures or services are at issue or being asked about. Without any of that specific context, I think this is very different from the contraceptive mandate cases. But with two courts suggesting that a religious exception can't apply, and then the Supreme Court's Bostock decision affecting Title VII, isn't there at least a credible threat of enforcement here? I don't think so, Your Honor. If the two courts you're referring to are the Walker Court and the Whitman-Walker Court, I just want to clarify that only one of those courts dealt with the Title IX religious exemption. But in light of Bostock and Whitman-Walker, I think it's still the case that RFRA is a freestanding statute separate from the Title IX religious exemption. And both agencies have made very clear in the EEOC Compliance Manual and in HHS's enforcement notifications that it's paying attention to RFRA. It knows that the government has to comply with this statute, and the statute is critical to informing how the agencies will exercise their enforcement discretion. So I think in light of that background, plaintiffs have not met their burden to show a credible threat of enforcement. The threat can't be speculative or hypothetical. It has to be sufficiently imminent to comply with Article III. And I think that if it were the case that some uncertainty about the law and uncertainty about how the agencies might exercise their enforcement discretion at some unspecified time in the future, this could really open the floodgates to premature litigation. Justice Alito noted in his Bostock dissent that over 100 federal statutes prohibit discrimination because of sex. So this comes up in the Title IX context and with the Department of Education and the Fair And if it were enough to have uncertainty about what the law means and about what the agencies might do in the future, that would mean that the day after Bostock came down, hundreds of thousands of religious entities could have sued the federal government, all of these different agencies, to challenge future applications of these statutes. But that can't be the case. That would be an evisceration of the limits of Article III. And this Court has acknowledged that pre-enforcement suits are not the norm. In the Minnesota Citizens for Concerned Life case, the Court acknowledged a judicial reluctance to entertain pre-enforcement suits that might interfere with agency enforcement discretion. And the Supreme Court recently said in the Whole Women's Health decision that the Court has never recognized an unqualified right to pre-enforcement review, even for constitutional claims. So given this backdrop where pre-enforcement suits are not the norm and the specifics of RFRA and how the Supreme Court said in Ocentro that the RFRA analysis needs to be tailored to the person and to the specific facts, I think that's why we rarely see RFRA pre-enforcement challenges. None of the cases that . . . Let me ask you, did the EEOC take the position in the Sixth Circuit that the RFRA rights were preempted by this situation? I think Your Honor might be referring to the Harris Funerals Home case in the Sixth Circuit. Yes. So the EEOC did take the position that Title VII applied to that employer despite that employer's reliance on RFRA, but that was a different context. It involved the employment of a transgender employee, which is a very different situation from providing gender transition surgery and related medical services. And in the Harris Funerals Home case, EEOC wasn't taking a blanket position that Title VII always prevails over RFRA, even in the context of employment. It said that, you know, in the specific context of that case, it looked at the burdens on that particular employer's religious exercise, and it looked at whether the government had shown a . . . or could show a compelling interest in the least restrictive means. RFRA requires this kind of narrow tailoring, and EEOC wasn't making any across-the-board conclusion. I understand that HHS and EEOC have some sort of an agreement that EEOC is going to handle this sort of discrimination with respect to certain health insurance plans, right? Your Honor, the district court did discuss this, what the district court referred to as an agreement, but I think this is actually a misunderstanding of what the 2016 rule said. So the 2016 rule was promulgated by HHS, you know, not by EEOC. They weren't involved in the rulemaking. And all that HHS was saying was that if it received administrative complaints of discrimination that were not in its jurisdiction, that were basically misfiled and should have been filed with the EEOC instead, HHS would just refer those complaints to EEOC. It wouldn't try to exercise jurisdiction over complaints that were properly with another agency. Has EEOC ever disavowed the 2016 rule? No, Your Honor, EEOC hasn't disavowed HHS's 2016 rule, interpreting a statute that HHS is charged with enforcing. But EEOC has made clear in its compliance manual that it understands the importance of RFRA and that RFRA will guide the way it determines how and when to bring enforcement actions. It acknowledges Bostock and the complexities in this area, and I think in light of these explicit statements by the agency, there is no credible threat of enforcement. I see that I am into my rebuttal time, so unless the court has further questions, I'll save the rest of my time for rebuttal. Thank you. Thank you, Ms. Cheung. Mr. Goodrich. I have the appellee's divided time for rebuttal. Yes, Your Honor. Our plan is that I'll take the first 14 minutes of argument to address the issues common to all plaintiffs. My name is Luke Goodrich. I represent the Religious Sisters of Mercy plaintiffs. My colleague at counsel table, Mr. Ian Spear, represents the Catholic Benefits Association plaintiffs. He'll take the remaining six minutes to address the issues specific to the CBA plaintiffs, such as their claim against the EEOC. The main problem with the government's position in this case, as Judge Grunder has pointed out, is that it runs straight into the teeth of this Court's well-settled jurisprudence governing pre-enforcement challenges. This Court has repeatedly held that there are three elements the plaintiff must establish in order to demonstrate injury sufficient to bring a pre-enforcement challenge. First is that their conduct is arguably affected with a constitutional interest. Second is that their conduct is arguably prescribed by the statute they wish to challenge. And third is that there's a credible threat of enforcement. The first element is undisputed here, so I won't spend time on that. I'll focus on the second and third elements. Now, that second element, is the plaintiff's conduct arguably prescribed by the statute they wish to challenge? The main problem with the government's argument here is they try to take what is an objective test, does the statute arguably prescribe the conduct, and transform it into a subjective test, what is the agency thinking in its mind or in its heart of hearts? Has it taken a position? But that's not the inquiry here. The question is not, has the agency taken the position that your conduct is prescribed? The question is, could statute in 281 Care Committee, quote, could reasonably be interpreted, unquote, to apply to the plaintiff's conduct? And that's clearly the case here for several of the reasons that Judge Grunder pointed out. Number one, HHS has clearly stated its position in the 2016 rule saying that categorical refusals to perform or ensure gender transitions, which is what our clients do, is unlawful on its face. That's the language of the 2016 rule. Has that rule been addressed, modified, suspended, any change in it since its placement? There was a vacater in the Franciscan case, but the issue is Walker and Whitman-Walker both brought that rule back into effect. Walker through both the idea of gender identity discrimination and gender stereotyping, and Whitman-Walker through just the gender stereotyping. So the 2016 rule is on the books today, and Walker and Whitman-Walker have said that is still in effect. But even the 2020 rule, the 2020 rule says we're going to interpret this in light of Bostock. And there are multiple court decisions that we have cited in our briefs. The Hammons case, the Pritchard case, Conforti case, Cruz case, Tovar case, and others. These are all private lawsuits brought against healthcare providers or organizations, including Catholic hospitals and Catholic health insurance plans, against defendants who engage in precisely the same conduct as our clients. They decline to perform or ensure gender transition procedures. And in those cases, every court to reach the question has held that those categorical refusals to provide insurance coverage or perform those procedures, that that states a claim for a violation of Section 1557. So in this objective inquiry, it doesn't matter what position has HHS taken, although it has taken a clear position in the 2016 rule. The question is, how does the statute reasonably interpret it and apply it? And the fact that multiple courts have interpreted it to prohibit exactly the conduct our clients are engaged in shows that it's not just arguably prescribed, it is actually prescribed by multiple courts across the country. So that second prong is easily satisfied here. I think their argument is that they will respect RFRA and not categorically try to enforce the 2016 rule. What's wrong with that argument if there hasn't been actual enforcement on their part? Yeah. So the issue with that is, on the second prong, the question is, could your conduct reasonably – is your conduct arguably prescribed by the statute you wish to challenge? And HHS is really – there is confusing standing with the merits, because in any pre-enforcement challenge, you have two different bodies of law. First you have the law that you're challenging, that you say arguably prescribes your conduct. And then second, you have the body of law that you say gives you relief from the first body of law. Here it's RFRA. In other cases, it's the Free Speech Clause, might be the Dormant Commerce Clause. And HHS doesn't dispute that if we were secular hospitals and we categorically declined these procedures, that would be a violation of Section 1557. What it's saying is, well, because you're religious, maybe, maybe that second body of law – we haven't thought about it yet, maybe not – maybe that second body of law will protect you. But that first body of law is – goes to standing, and the second body of law goes to the merits. Because once you show that that first body of law arguably prescribes your conduct, you have standing. You satisfy that second element. If you're able to show that that second body of law protects you, well, you win on the merits. You don't, you know, dismiss the pre-enforcement challenge because, you know, applying the statute would violate the First Amendment or would violate RFRA. And this Court in the Turtle Island Foods case said you cannot conflate standing and pre-enforcement challenge context. Turning to that third factor, the credible threat of enforcement, this Court in 281 Kerr, Jones, and Gertner said that if a plaintiff establishes those first two elements, the third element is assumed as a matter of law, except in, quote, extreme cases approaching despotude, unquote. And here, we're very clearly, clearly far from despotude. This statute is only 1557 is only 11 years old. There have been two major rulemakings in the last five years. There are multiple lawsuits pending today under Section 1557 against entities that engage in the same conduct as our clients. And HHS just issued a notification of enforcement months ago saying we will enforce Section 1557. So that alone, the fact that we satisfy the first two elements and this statute is far from despotude, that alone is enough to establish a credible threat of enforcement. But we have much more than that here. And if you want to write a really narrow opinion, I'd say there are four additional elements that establish the credible threat of prosecution here. I think it was kind of like four different types of icing on the cake. The first one is the history of actual enforcement. Now, there was a nationwide injunction in Franciscan shortly before the rule, the 2016 rule went into effect. So HHS hasn't had a lot of time to enforce the statute because it's been enjoined. Nevertheless, they had already received a complaint against the Catholic Hospital. That's Supplemental Appendix 679, Note 1. They had already told the complainant in Conforti that we will investigate your complaint against this Catholic Hospital. They had already started an investigation against the state of Texas for the very same policies that our clients have adopted. So that's, you know, history of enforcement is relevant under Dreehouse. The second type of icing and way to narrow the opinion is that you have the refusal to disavow enforcement. This court in Gertner said a refusal to disavow enforcement supports the credible threat of enforcement. And counsel today refused to disavow enforcement. And HHS has actually done the opposite. It has repeatedly vowed in the 2016 rule it promised, quote, robust enforcement. In the 2020 rule, it promised to, quote, vigorously enforce Section 1557. Its recent notification of enforcement just months ago said we will enforce Section 1557 to prohibit gender identity discrimination. And so — Are these enforcement actions all in the record? Yes, Your Honor. The Supplemental Appendix 679, Note 1, the Conforti case, and 679, Note 2, are all in the record. The third type of icing on the cake is the fact that Section 1557 can be enforced via private complaints. And this court in 281 Kerr and the Supreme Court in Dreehouse said the availability of private complaints supports the credible threat of enforcement. And here you actually have those complaints. You have the ACLU and Land Illegal have filed complaints with the HHS against Catholic entities for alleging gender identity and sex discrimination. You have the multiple private lawsuits I already mentioned, Hammonds, Pritchard, both of those involve Catholic entities, Conforti, Cruz, Tovar. So there's private enforcement going on right now which underscores the credible threat of enforcement. And then the fourth narrowing element I think of as — it's like the cherry on top — is HHS's conduct in this very litigation. It spent years telling the district court, there's no threat of enforcement, it's all speculative, the plaintiffs have nothing to worry about. But then the moment the district court entered its permanent injunction, within days, HHS came back and filed a motion to modify the injunction, so that's supplemental appendix 721 to 22, told the district court, actually, Your Honor, we have a serious problem. We are at risk of violating your injunction and being held in contempt of court because we're actively enforcing section 1557 and we anticipate we might as well enforce it against the plaintiffs in this very case, namely members of the Catholic Benefits Association, because we don't know who the members of the Catholic Benefits Association are. So we might launch an enforcement action against the plaintiffs and be held in contempt of court. So we need you to modify your language of injunction and say, if we go after one of these CBA plaintiffs and then they inform us they're covered by the injunction and we pull back and stop enforcing, we won't be held in contempt of court. And the court granted that request. But you can't find any pre-enforcement challenge, I don't think, where the government has so clearly stated, we actually anticipate a risk that we are going to enforce against the plaintiffs in this very case. And that makes this an easy case. The other problem with the government's position goes to Judge Grunder and the analogy to the HHS contraception mandate cases. That is on all fours here. There, as here, the government, HHS, promulgated a regulation requiring religious organizations to include objectionable services in their health insurance plan. And multiple courts considered pre-enforcement challenges. There were scores of pre-enforcement challenges brought under RFRA against the contraception mandate. HHS had not initiated enforcement action. It had not punished anybody. They were pre-enforcement challenges. The Hobby Lobby opinion in the Tenth Circuit, the Corte opinion in the Seventh Circuit, they considered jurisdiction. Is there jurisdiction? I may be mischaracterizing, but I think Ms. Chung's response to my question was that it was clear there that there was an intent to enforce. Does that make it different than this case? Well, I think there's — it's clear that there's an intent to enforce here as well. What I understood Ms. Chung to say is the difference there, it was specific things you had to include in your health insurance plan, different forms of contraception. And here, well, we don't know what you need to include in your insurance plan to avoid a finding of gender identity discrimination. But the 2016 rule is quite specific. It says that if you categorically decline to cover all gender transition procedures, which is what our clients do, that is unlawful on its face. That's a quote from the 2016 rule. And that's how these courts have interpreted it in the Hammons, Pritchard, Conforti, Cruz, and Tovar cases. And just to wrap up, I think the big problem here is HHS has strung up a massive sword of Damocles over the head of religious doctors and hospitals across the country with its broad pronouncement that you need to provide and ensure gender transition procedures or else face the risk of multimillion-dollar penalties. It knows, it knows this raises huge issues under RFRA, and yet it has staunchly refused to grant a clear religious exemption, and it even boasts that we just haven't thought about it yet. We're not going to tell you how RFRA applies or doesn't apply until we have an actual enforcement action. So it's basically telling these plaintiffs, go ahead, roll the dice, wait until a patient enforcement action, and maybe you'll win, maybe you won't. But that's precisely the type of Catch-22 that the Supreme Court held is a substantial burden in Hobby Lobby and Little Sisters of the Poor. It's precisely the type of Catch-22 that supported over a dozen permanent injunctions in the pre-enforcement challenges to the contraception mandate, and it's precisely why we have a doctrine of pre-enforcement challenges. Counsel, would you remind me what's, with the Chief's permission, if you're going over time a little bit here, what specifically the district court enjoined here? I mean, what is the specific language in the injunction that the agencies are prohibited from doing? Sure. The language, interestingly, is based on the same permanent injunctions issued in multiple contraception mandate cases, and what it says is the agency is enjoined from interpreting or enforcing section 1557 of the Affordable Care Act, whether that's directly under section 1557 or via regulation, to require these plaintiffs, in this specific case, it's not a nationwide injunction, to require these plaintiffs to perform or provide insurance coverage for gender transition procedures in violation of their conscience. I want to make sure my co-counsel has time, but we respectfully ask that you affirm Judge Welty's well-reasoned opinion. Thank you. Thank you, Mr. Goodrich. Mr. Speer. Good morning, and may it please the Court, I'm Ian Speer. I represent the Catholic Benefits Association plaintiffs. I'd like to address the Title VII side of this case and issues that are specific to the Catholic Benefits Association. Title VII bars gender identity discrimination. Bostock told us this last year, but it's been the EEOC's unwavering position since at least 2012, and the EEOC has enforced that specific interpretation in the context that's at issue here by requiring employers to cover gender transition services in their health plans. These were employers in these enforcement actions, just like the plaintiffs in this case who are subject to Title VII. But this is sufficient for standing. In a pre-enforcement case like this, plaintiffs don't have to show that they've been specifically targeted by the EEOC. They need to show that their conduct is arguably prescribed by Title VII and that the threat of future enforcement is credible. In a situation like this, this Court has said that to eliminate standing, there must be compelling evidence that the government actually rejects a statute, such as through a long history of disuse. That's what this Court said in the 281 Care Committee case. But that's the opposite of what we have here. Title VII's plain language arguably makes these plaintiffs' conduct illegal in excluding gender transition services from their health plans. There's a history of recent enforcement by the EEOC on that very issue. And since Bostock, the EEOC has only reflexed its Title VII muscle, announcing that Bostock reiterates its, quote, established positions, end quote, on gender identity discrimination. In most telling, as Mr. Goodrich highlighted, as soon as the injunction issued here against the EEOC and HHS, both agencies promptly moved to modify it to, quote, guard against the risk of contempt. We would submit that that's a straightforward admission by the government that the threat of enforcement here is at least credible. The EEOC tries to dodge judicial review with a series of maybes. It says maybe it will deviate from its established positions on gender identity discrimination. It might allow religious institutions to exercise their faith as these plaintiffs here are doing. It might, it says, use its enforcement discretion responsibly. But agency hedging in an appellate brief doesn't eliminate a credible threat of enforcement. We think Judge Welty was correct to find that the Catholic Benefits Association's challenge in this case is justiciable. And we would ask the Court to affirm his ruling. Thank you. Your clients also challenged on the 1557 as well, right? Yes, Your Honor. We did. Don't you have an associational standing problem with respect to the Summers decision in that regard? No, Your Honor. We do not. The Summers decision is not applicable here. That's a decision where an association sought to base its standing on the statistical probability that maybe some of its members were affected by a challenged law. The CBA's associational standing is not based on statistical probability, but based on actual members, health care providers and employers who are affected by both of these statutes. Did your complaint identify any members other than the three co-plaintiffs who would have standing to sue on their own? We did identify members, Your Honor, and we put forward facts by affidavit in a verified complaint regarding the effect of these statutes on our members. We have, for example, the Diocese of Fargo named plaintiff in this case, member of the Catholic Benefits Association. We explain in our verified complaint as well as our briefing below how 1557 and Title VII worked together to burden the diocese's health coverage decisions. The other thing that the CBA did is in its verified complaint, it made sworn declarations regarding members and how they're affected by these statutes. That's in Appellant's Appendix 145 through 146. We pointed out we have member hospitals in the CBA who are covered entities under Section 1557. We have member ministries with health programs that receive federal funding and thus are affected by 1557. We have member employers like Diocese of Fargo whose plans are insured or administered by covered entities like Blue Cross Blue Shield. And we have member employers, again, like Diocese of Fargo and the other named plaintiffs who are subject to Title VII. We put forward those facts in a verified complaint. The government never contested those below and we went to summary judgment in this case. The district court was correct to rely upon those as undisputed facts supporting the CBA's associational standing. And I would point the court to, as my time is running out, in our brief we talked about Diocese of Fargo specifically and the way both of these statutes, 1557 and Title VII, worked together to impose a burden on it, a real burden that continues to this day. And we would submit that that supports standing in this case for the CBA plaintiffs. Thank you, Mr. Saphir. Thank you, Your Honor. Ms. Cheung. Thank you, Your Honor. I'd like to make three quick points in rebuttal. So first, the government is not mixing the merits with standing. It is impossible to put RFRA aside when doing the Article III standing analysis because RFRA informs how the agencies will exercise their enforcement discretion and RFRA is therefore critical in understanding whether or not plaintiffs have shown a credible threat of enforcement. Again, RFRA requires individualized determinations as to what context constitute gender transition and whether the government can show a compelling interest in narrowly tailored means. Is the standard, I think the other side said the standard was arguable. Threat of enforcement, is it credible or arguable? It's credible, Your Honor. The Supreme Court is very clear in the SBA List case that there are three prongs to the test. The second prong is arguably prescribed, but the third prong, which is a separate factor, is whether there is a credible threat of enforcement. One is arguable. The other is credible. That's right, Your Honor. And the SBA List case was clear that the threat and enforcement must be sufficiently imminent. So credible can't just mean, you know, there might be some future – Okay. So will you concede the second prong, that it's at least arguable that Title VII now and 1557 would prescribe their conduct? We don't concede the point, Your Honor. On the second prong, we have to look at both 1557 and Title VII in conjunction with RFRA. And when you look at the relevant statutes, including RFRA together, there is considerable uncertainty about what specific conduct is prescribed under all three federal statutes. You don't even think it's arguable? No, Your Honor. We don't think plaintiffs have met their burden on the arguably prescribed prong. But again, focusing on the third prong, which is that the credible threat of enforcement, plaintiffs haven't shown that it's sufficiently imminent. What about your – what's your response to the suggestion that there's a legal effect or legal impact to your request to the district court to avoid potential contempt because of potential enforcement activities? Your Honor, the government's diligence in making sure that it understood the district court's injunction and understood what it was required to do is not at all an admission that the government intends to enforce these statutes against objecting religious plaintiffs. Again, there has been no enforcement activity brought by either agency. What about the litany of alleged enforcement actions that was argued by the other side? Sure. So these are addressed on pages 6 and 7 of the government's reply brief, and I can walk through the three examples. So the first example of past enforcement that plaintiff referred to is HHS receiving a complaint against a Catholic hospital for denying birth control to a cisgender woman, a non-transgender woman. So that has nothing to do with requiring a hospital to provide gender transition services. The second example, HHS indicated that it would initiate an investigation against a Catholic hospital for denying birth control to a non-transgender woman, a non-transgender  So that has nothing to do with requiring a hospital to provide gender transition services. But again, these administrative investigation, sorry, these administrative investigations are very different from bringing enforcement actions in court. During the administrative investigation, that's an opportunity for the religious entity to raise RFRA for the government to realize that it's a religious entity and to decide not to bring an enforcement action. And in fact, in that case, Confortee, there was no enforcement action brought in court. And the third example that plaintiff referred to was an investigation of a state for declining to cover transition procedures in its Medicaid program. But a state, of course, can't assert a RFRA defense, and investigating an entity that can't raise a RFRA defense is very different from saying there is a credible threat of religious entities in light of how RFRA informs the agency's decisions about their enforcement discretion. I see that I'm over my time. I'm wondering if I could just make my last two points very quickly. How long will that require? Maybe 30 seconds. Okay. Okay. Thank you. I wanted to give one more example about why RFRA can't be analyzed in the abstract. You might have a transgender patient with breast cancer who needs a double mastectomy. The patient might be a transgender person who also wants the double mastectomy as part of transition services. But until we have a specific developed factual record, we don't know how to understand these medical services, whether it's transition or not. We don't know what a specific religious entity would do in that case. So in terms of ripeness, this is really not fit for judicial review, because in this case, there are no developed facts. And finally, in terms of ripeness, I would just say that there is no hardship for these plaintiffs. The Supreme Court said that mere uncertainty about the law is not enough to show a hardship. And here, plaintiffs have not demonstrated any chill of their religious exercise. And in fact, the record demonstrates that they are practicing medicine and providing insurance coverage in line with their religious beliefs. So there's no harm in delaying judicial review until there are actual facts. Thank you, Ms. Chung. Thank you. Thank you also, Kelly.